913 P.2d 262

David F. **LIHOSIT**, Plaintiff–Appellant,

v.

I & W, **INC.**, A New Mexico Corporation, Defendant–Appellee.

No. 16285.

Court of Appeals of New Mexico.

Jan. 17, 1996.

Certiorari Denied March 6, 1996.

Perry C. Abernethy, Abernethy Law Office, P.C., Carlsbad, for Plaintiff–Appellant.

Robert P. Tinnin, Jr., Paul G. Nason, Hinkle, Cox, Eaton, Coffield & Hensley, P.L.L.C., Albuquerque, for Defendant–Appellee.

### OPINION

BLACK, Judge.

David F. Lihosit (Lihosit) was employed as a truck driver by I & W, Inc. (I & W). In his complaint, Lihosit alleged I & W violated clear public policy by terminating him because he refused to return to work late at night to drive a truck in violation of state driving and hours-of-service regulations. I & W argued it did not have knowledge of this explanation for Lihosit's failure to return to work and, therefore, could not have discharged him in retaliation for his involvement in a protected activity.

The case comes to this Court on Lihosit's appeal of a summary judgment based on stipulated and undisputed facts. We affirm.

## I. FACTS

Lihosit's job with I & W was to drive a large tractor trailer transporting water, oil, and chemicals to oil rigs. These materials were to be delivered to the job site at any time it was necessary. After leaving work at 8:35 p.m. on May 13, 1991, Lihosit received a telephone call at home around 10:30 p.m. The call was from Artesia Answering Service, an independent business with which I & W contracted to relay messages to I & W employees. Ralph Lewis of Artesia Answering Service relayed a message to Lihosit to return to work within the hour because an I & W customer had lost circulation in an oil well and needed water. Reading the facts most favorably to the plaintiff, Lihosit told Lewis he was too tired to work and would be in the next morning at 7:00. Lihosit said Lewis twice replied, "This may be your job." Lihosit then told Lewis that any additional work on Lihosit's part would violate "hours-in-service" regulations.

While there is a dispute over what Lihosit told Lewis, there is no dispute that Lewis did not tell anyone associated with I & W that Lihosit declined to return to work because he was too fatigued and/or because it would violate any legal regulation. Lewis did tell Larry Richardson, Lihosit's supervisor at I & W, that after Lihosit was told to come back to work, Lihosit replied, "I work days. I will be there at 7:00 in the morning." Richardson was not informed of Lihosit's contention that further service on May 13 would have violated state law until Lihosit's unemployment compensation hearing on September 10, 1991.

The trial court set forth the following stipulated and undisputed facts in its order granting summary judgment:

A. David Lihosit's employment with I & W Inc. was terminated by Larry Richardson on May 14, 1991 as a result of Plaintiff's refusal to return to work in his capacity of a transport operator to assist in restoring drilling circulation to an I & W Inc. customer's well.

B. David Lihosit did not tell any employee of I & W Inc. on May 14, 1991, and, in particular Larry Richardson, the I & W Inc. employee who terminated David Lihosit's employment, the reason he alleges in his Complaint for his refusal to return to work, which refusal formed the sole basis for David Lihosit's termination.

C. No employee of I & W Inc., and in particular Larry Richardson, had actual knowledge on May 14, 1991 that David Lihosit had refused to return to work because he claimed that the return to work would have violated the hours of service regulations of the State as set out in N.M.S.A.1978 Sec. 65–3–11 (Repl. Pamp.1990) and Motor Carrier Safety (MCS) regulations 11:395, et seq., as alleged in the Complaint.

On May 14, 1991, I & W fired Lihosit for failing to return to work the previous night. On June 12, 1992, Lihosit sued I & W for retaliatory discharge, claiming he was fired because he refused to exceed the maximum number of driving hours allowed under New Mexico law. The district court granted summary judgment against Lihosit because the court found that I & W did not have knowledge of Lihosit's alleged reasons for failing to report to work and, therefore, the termination was not in retaliation for engaging in a protected activity.

## II. RETALIATORY DISCHARGE REQUIRES A CAUSAL CONNECTION BETWEEN PROTECTED CONDUCT AND WRONGFUL TERMINATION

■ In the absence of a contract between an employer and employee, New Mexico presumes employment is terminable "at-will." *Hartbarger v. Frank Paxton Co.,* 115 N.M. 665, 668, 857 P.2d 776, 779 (1993), *cert. denied,* 510 U.S. 1118, 114 S.Ct. 1068, 127 L.Ed.2d 387 (1994). "An at-will employment relationship can be terminated by either party at any time for any reason or no reason, without liability." *Id.* New Mexico courts have, however, recognized an exception to this general rule when an employee is discharged in retaliation for engaging in an act favored by public policy. *See Paca v. K-Mart Corp.,* 108 N.M. 479, 481, 775 P.2d 245, 247 (1989). "Consequently, an at-will employee may recover in tort when his discharge contravenes a clear mandate of public policy." *Gutierrez v. Sundancer Indian Jewelry, Inc.,* 117 N.M. 41, 47, 868 P.2d 1266, 1272 (Ct.App.1993), *cert. denied,* 117 N.M. 121, 869 P.2d 820 (1994). Following generally recognized tort principles, an employee seeking to recover for retaliatory discharge must show a causal connection between his protected actions and his discharge. *Shovelin v. Central N.M. Elec. Coop.,* 115 N.M. 293, 303, 850 P.2d 996, 1006 (1993).

Our Supreme Court considered the causation requirement in *Chavez v. Manville Products Corp.,* 108 N.M. 643, 777 P.2d 371 (1989). In that case, Chavez was a longtime Manville employee who expressly refused to allow his name to be used in a corporate lobbying effort. The corporation nonetheless affixed Chavez's name to a mailgram addressed to a United States Senator which stated the undersigned employees, including Chavez, urged support of legislation favored by the corporation. When Chavez found out about the unauthorized use of his name, he angrily demanded an explanation. The fol-

lowing month, Chavez was notified by his overall supervisor, Loretta Turner, that he was being laid off for a month. Subsequently, Chavez was notified his job had been eliminated. Chavez was informed that only two foremen were now required and he was the worst of the three foremen currently employed.

The New Mexico Supreme Court reversed a directed verdict in Manville's favor and held that these facts presented a jury question as to whether Chavez's refusal to lobby Congress in support of his employer's position was the basis for a retaliatory discharge claim. *Id.* at 647–48, 777 P.2d at 375–76. The Supreme Court found it unnecessary to adopt a standard that would shift the burden to the employer once the employee introduced "evidence of circumstances that justify an inference of retaliatory motive, such as protected conduct closely followed by adverse action." *Id.* at 648 n. 2, 777 P.2d at 376 n. 2. Rather, the Court recited in detail the extensive evidence which created a jury question on whether the discharge was in retaliation for Chavez engaging in a protected activity:

When we consider as true the following evidence presented by Chavez: that on April 4, the day after his refusal to participate in Manville's lobbying effort, Loretta Turner, said to be informed of the refusal, placed an unwarranted critical memo in Chavez' file concerning his unsafe use of certain equipment; that on the same day his immediate supervisor advised him that he had better be careful because "Loretta is after you"; that when Chavez requested an explanation from his immediate supervisor for the unauthorized use of his name in the lobbying effort, Manville, shortly thereafter, made a decision to terminate him; that after being "laid off" for a month he was advised that his job had been eliminated; that after his termination the number of production crews remained unchanged at two, and Chavez' supervisory position was taken by another employee who had for over five years been assigned to other duties; that Manville made no efforts to place Chavez, an employee of 20 years, in any other position, despite a company policy to the contrary, and instead listed him as being ineligible for future

employment with Manville in any capacity, it was well within the province of the fact finder to reach an abiding conviction that the discharge was in response to his non-cooperation with Manville's legislative agenda.

*Id.* at 648–49, 777 P.2d at 376–77.

We have no such facts in the case before us. There was no dispute in *Chavez* that the employee made it known to his supervisors well before the termination that he refused to support the employer's political activity. Here, however, it is stipulated that no such message was conveyed to anyone at I & W at any time before Lihosit was fired. Rather, on the record before us, the trial court found:

5. There is no dispute that the employer, I & W, Inc. and, in particular Larry Richardson, the employee who terminated the Plaintiff, did not have actual knowledge at the time he terminated the Plaintiff that the Plaintiff refused to return to work because his return to work would violate the hours of service regulations of the state, which refusal formed the sole basis for the Plaintiff's termination.

The Supreme Court in *Chavez* found sufficient evidence to create a jury question as to whether the employee was fired because of his protest over unauthorized political activity. *Chavez* did, however, recognize that retaliatory discharge is an intentional tort. *Id.* at 649, 777 P.2d at 377. Unlike *Chavez*, the issue here is whether I & W could have intentionally retaliated when it was unaware of Lihosit's position that he was engaging in a legally protected activity.

■ It is widely recognized that the employer's motive is a key element of retaliatory discharge. *Reich v. Hoy Shoe, Co.*, 32 F.3d 361, 367–68 (8th Cir.1994); *Ortega v. IBP, Inc.*, 255 Kan. 513, 874 P.2d 1188, 1194 (1994); *Lueck v. United Parcel Serv.*, 258 Mont. 2, 851 P.2d 1041, 1044–45 (1993); *Texas Division–Tranter, Inc. v. Carrozza*, 876 S.W.2d 312, 313 (Tex.1994). "Obviously, an employer cannot fire an employee in retaliation for actions of which the employer is unaware." Elletta Sangrey Callahan, *The Public Policy Exception to the Employment at Will Rule Comes of Age: A Proposed*

*Framework for Analysis,* 29 Am.Bus.L.J. 481, 498 (1991); *cf. White v. American Airlines, Inc.,* 915 F.2d 1414, 1422 (10th Cir. 1990) (The trial court instructed the jury that "an essential element of plaintiff's wrongful discharge claim was that 'plaintiff refused to commit perjury and defendant knew of such refusal.' "). Therefore, an employee fails to prove the causal connection necessary to sustain a claim for retaliatory discharge when there is no evidence that the persons responsible for his discharge had any knowledge the employee engaged in an activity alleged to be protected. *Parham v. Carrier Corp.,* 9 F.3d 383, 387 (5th Cir.1993); *Talley v. United States Postal Serv.,* 720 F.2d 505, 508 (8th Cir.1983), *cert. denied,* 466 U.S. 952, 104 S.Ct. 2155, 80 L.Ed.2d 541 (1984); *Carter v. Bennett,* 651 F.Supp. 1299, 1301 (D.D.C.1987) (mem.), *aff'd,* 840 F.2d 63 (D.C.Cir.1988); *Beckman v. Freeman United Coal Mining Co.,* 123 Ill.2d 281, 122 Ill.Dec. 805, 808, 527 N.E.2d 303, 306 (1988); *see also Hickman v. May Dep't Stores Co.,* 887 S.W.2d 628, 631 (Mo.Ct.App.1994).

 While it is not at all clear Lihosit's return to work on the evening of May 13 would have been a violation of any legal requirement, it is clear I & W was not given the opportunity to consider his contention, much less retaliate based on this assertion. The termination, therefore, cannot have been in "retaliation" for anything other than insubordination, clearly an appropriate ground in a termination-at-will situation, where no reason at all is legally required. Once I & W brought forth evidence Lihosit was terminated for insubordination, it became Lihosit's burden to show a question of material fact as to a wrongful purpose for the termination. *Dow v. Chilili Coop. Ass'n,* 105 N.M. 52, 55, 728 P.2d 462, 465 (1986) (once proponent brings forth evidence, the party opposing a summary judgment may not simply argue that facts may exist which would secure a trial on the merits). Discharging an at-will employee is not in itself a violation of public policy. What is a violation of public policy is discharging an employee with the intent to subvert a clear mandate of public policy.

 Lihosit argues that the explanation of protected activity he alleges he provided to Artesia Answering Service should be attributed to I & W, but he provides no direct legal authority in support of this theory. *See Wilburn v. Stewart,* 110 N.M. 268, 272, 794 P.2d 1197, 1201 (1990) (issues not supported by legal authority will not be reviewed). The courts which have considered such an argument, however, have rejected the contention and applied the same logic which underlies the actual knowledge requirement. As the Fifth Circuit reasoned in *Corley v. Jackson Police Department,* 639 F.2d 1296, 1300 n. 6 (5th Cir.1981), "The key to a retaliation case . . . is actual motive; constructive notice cannot create actual intent to retaliate." *See also* Michael D. Wulfsohn, Comment, *Martin Marietta v. Lorenz: Palpable Public Policy and the Superfluous Sixth Element,* 70 Denv.U.L.Rev. 589, 610 (1993) ("Retaliation simply cannot 'exist' in the absence of a *reason* to retaliate.").

The court refused to attribute the knowledge of certain employees not involved in the termination to the employer in *Featherson v. Montgomery County Public Schools,* 739 F.Supp. 1021 (D.Md.1990) (mem.). The plaintiff, Featherson, brought suit alleging, *inter alia,* she had been denied promotion in retaliation for previous claims she had filed against the Montgomery County Public Schools (MCPS) under the Equal Employment Opportunity (EEO) Act. The United States District Court granted the school district a summary judgment saying:

There is absolutely no evidence that the persons involved in any of the alleged adverse decisions affecting Featherson, i.e. her non-admission to the Assessment Centers and her non-appointment to acting assistant principal positions, knew at the time that the decisions were made that plaintiff had filed any EEO claims. Plaintiff argues that the knowledge of other representatives of MCPS should be imputed to the persons who made the decisions in question. This is nonsense. As a matter of logic and of fact, a person cannot make an adverse, retaliatory decision based upon information of which s/he is unaware. *See Ross [v. Communications Satellite Corp.],* 759 F.2d [355] at 365 n. 9 ("if the employer did not know of the

protected activity a causal connection to the adverse action cannot be established"). *Id.* at 1025–26.

The dissent expends substantial effort distinguishing the retaliatory discharge cases from other jurisdictions largely based on the contention that "New Mexico emphasizes the policy goals of the tort, not the ill-motives or bad faith of the employer." (Dis. op. at 269.) While the dissent cites no legal support for this premise it relies on *Shovelin v. Central N.M. Elec. Coop., Inc.,* 115 N.M. 293, 850 P.2d 996 (1993), to define the "linchpin" of the tort of retaliatory discharge. In *Shovelin,* however, our Supreme Court did not indicate there was anything unique or unusual about New Mexico's recognition of this tort. Rather, our Court cited and relied upon myriad cases from other jurisdictions in deciding whether Mr. Shovelin stated a cause of action for retaliatory discharge.

■ Nor does the dissent cite any direct authority for its contention that whatever information Lihosit might have conveyed to Artesia Answering Service must be attributed to I & W to provide the basis for the motive for the tort. For example the dissent's reliance on *Kimbro v. Atlantic Richfield Co.,* 889 F.2d 869 (9th Cir.1989), *cert. denied,* 498 U.S. 814, 111 S.Ct. 53, 112 L.Ed.2d 28 (1990), is completely misplaced. The appellate court in *Kimbro* affirmed the district court's dismissal of plaintiff's retaliatory discharge claim. We believe the dissent's reliance on the general proposition that the knowledge of an agent may be imputed to the principal where such knowledge is relevant to matters entrusted to the agent, is misplaced. The recognized exceptions to this proposition are crucial to the decision in this case. The first exception provides, "If the state of mind of a principal in a transaction is a factor, a notification by a third person giving information to an agent who does not communicate it to the principal does not operate with like effect as a similar notification given to the principal." Restatement (Second) of Agency § 268 cmt. d (1957). Moreover, if "the motive and knowledge with which an act is done is a factor in the existence of a cause of action, [i]nformation given to an agent for the purpose of notice does

not, of itself, give information to the principal." *Id.* As the previous discussion indicates, the intentional tort of retaliatory discharge requires knowledge of the favored activity by the employer at the time of the discharge. Thus, the central element of retaliatory discharge is whether the employer's motive for discharging the employee was the employee's engagement in protected activity. Without knowledge of the employee's protected activity by the principal, the principal cannot have the required motive. The uncommunicated knowledge of an agent, therefore, is insufficient to establish the employer's liability for retaliatory discharge.

■ The Restatement (Second) of Agency also provides that it is not sufficient that a party has a means of information in situations where, to be held responsible, the act must be done with knowledge. *Id.* § 275 cmt. b. When knowledge is required for purposes of tort liability, the central issue is the knowledge of the actual tortfeasor, which knowledge cannot be imputed from an agent. *See Woodmont, Inc. v. Daniels,* 274 F.2d 132, 137 (10th Cir.1959), *cert. denied,* 362 U.S. 968, 80 S.Ct. 955, 4 L.Ed.2d 900 (1960); Warren A. Seavey, *Handbook of the Law of Agency* § 98, at 181 (1964) ("If personal knowledge is required for liability, the knowledge of an agent is not imputed to the principal."); *cf. Sisk v. McPartland,* 267 Or. 116, 515 P.2d 179, 181 (1973) (discovery sanction).

Since Lihosit does not claim anyone at I & W had any knowledge of his contention that further driving on May 13, 1991, would violate state law, his claim for retaliatory discharge must fail. The summary judgment entered by the district court is affirmed.

**IT IS SO ORDERED.**

HARTZ, J., concurs.

BUSTAMANTE, J., dissents.

BUSTAMANTE, Judge, dissenting.

The majority finds against the Plaintiff on the sole basis that the supervisor who carried out his termination was not personally aware of Plaintiff's claim that driving more that day would violate state hours-in-service regulations. The majority refuses to charge the

employer I & W with receipt or notice of the message assertedly given to I & W's agent, Artesia Answering Service (the Answering Service). In reaching its decision, the majority fails to adequately address the nature of the agency relationship between I & W and the Answering Service, and imposes an unnecessary element of causal proof in public policy termination cases.

### GENERAL RULE OF AGENCY

The general rule is that "the liability of a principal is affected by the knowledge of an agent concerning a matter ... upon which it is his duty to give the principal information." Restatement (Second) of Agency § 272 (1957). Similarly, "notification given to an agent is notice to the principal if it is given: (a) to an agent authorized to receive it; (b) to an agent apparently authorized to receive it; (c) to an agent authorized to conduct a transaction, with respect to matters connected with it as to which notice is usually given to such an agent...." *Id.* § 268. The majority's refusal to apply these general rules to the benefit of Plaintiff here must flow from some characteristic of the agency relationship between I & W and the Answering Service or from the nature of the tort Plaintiff relies upon.

The majority does not explore the agency relationship in any detail. As described, the agency relationship fits within the general rules quoted above. The record reveals that I & W used the Answering Service to convey information to its drivers outside their normal working hours. For example, the call ordering Plaintiff back to work was placed at approximately 10:30 p.m. It is reasonable to presume that I & W relied on the Answering Service to report back on its conversations with its drivers. It is also reasonable to presume that the drivers relied on the Answering Service to report their responses to I & W's requests to report to work. It is obvious that, as an intermediary, the Answering Service had a duty to accurately convey information in both directions. Both I & W and the drivers had the right to rely on the Answering Service's actual or apparent authority to receive and convey information accurately. There is no indication that the Answering Service's interests were in any way adverse to I & W. *See id.* § 275.

The drivers' responses to requests to return to work were part of the subject matter of the agency, and the Answering Service had a clear duty to give the principal accurate information. *See id.* §§ 268, 275. The drivers had the right to rely on the Answering Service's apparent authority to receive information on behalf of I & W. In a situation in which I & W has consciously chosen to receive information through an agent of its selection, it is wholly proper to treat information given to the agent as given to the principal I & W. Refusing to do so foils the drivers' reasonable expectations; expectations created by I & W when it set up the message service for its own benefit.

In this sense, the Plaintiff's case is different from those relied upon by the majority in which notice was given to persons who were not authorized to receive the information or who had no duty to convey the information to anyone else. *Cf. Corley v. Jackson Police Dep't,* 639 F.2d 1296 (5th Cir.1981) (court refused to impute city attorney's knowledge that plaintiffs had filed a discrimination lawsuit to police chief who fired plaintiffs); *Featherson v. Montgomery County Pub. Sch.,* 739 F.Supp. 1021 (D.Md.1990) (mem.) (court refused to impute knowledge of school district employees who knew plaintiff had filed EEO Act claims to school district committee members who did not promote plaintiff). The cases cited in the penultimate paragraph of the opinion are similarly distinguishable.

In *Woodmont, Inc. v. Daniels,* 274 F.2d 132 (10th Cir.1959), *cert. denied,* 362 U.S. 968, 80 S.Ct. 955, 4 L.Ed.2d 900 (1960), the cause of action was for fraud in execution of a contract. *Id.* at 134. The court held that it would not impute bad faith to the board of directors of the defendant company when there was no evidence that those directors actually knew the plaintiff relied on misrepresentations. *Id.* at 137. However, the court also held that because two company employees who negotiated the contract did know about both the reliance and the misrepresentations (although the representations had originally been made in good faith by

other employees who did not know their representations were false), "the information and acts of [the negotiating employees] were the information and acts of the companies whom they represented." *Id.* at 138. Thus, the court imposed liability on the company for fraud. In *Sisk v. McPartland*, 267 Or. 116, 515 P.2d 179 (1973), the defendant was found liable by a default judgment imposed as a sanction for "willfully" failing to appear at a deposition. The attorney representing the defendant had not been able to find the defendant to tell her about the deposition. The trial court held that service of the notice of deposition on the attorney was sufficient. *Id.* at 180. On appeal, the court held that a party had to actually receive notice of her deposition before it could find that the party had acted "willfully," or with volition in failing to appear. *Id.* at 181. Clearly, both of these cases are distinguishable.

Finally, with regard to the nature of the agency, I believe the majority's analysis has been unduly influenced by the fact that the agent here was an independent contractor and not an employee. I find it difficult to believe that the majority would reach the same result if the same conversations reported in the record had occurred between Plaintiff and an in-house dispatcher. The analysis here would do better to follow the pattern of cases such as *Kimbro v. Atlantic Richfield Co.*, 889 F.2d 869 (9th Cir.1989), in which the court held the employer liable under state handicap discrimination law despite the contention that management personnel who made the decision to terminate employee were not personally aware that employee's absences from work were due to medical condition for which reasonable accommodation was required. Affirmance of dismissal of the ERISA retaliation claim was based solely on lack of evidence, not connected in any way on the issue of imputation of knowledge.

## NATURE OF THE CAUSE OF ACTION

The majority's refusal to charge I & W with receipt of the information assertedly conveyed by Plaintiff to the Answering Service is couched in terms of the causal connection required between the employee's act (or refusal to act) in service of a clear public

policy and the employer's decision to terminate. Put colloquially, the majority's position is: How can an employer retaliate if it is not personally aware of the employee's motivation? Framed this way, the question would seem to answer itself.

In my view, however, the majority's treatment of the tort is unduly narrow. The majority analyzes the cause of action from the point of view of the employer, emphasizing the need for proof of both the employer's and the employee's motivation. The analysis carries with it the implicit view that the employer must be found to have acted with a malevolent purpose or evil intent, or with a guilty state of mind. This approach ignores the purpose of the cause of action: that is, to encourage employees *and* employers to act in accordance with and in furtherance of clear public policy objectives. *Chavez v. Manville Prod. Corp.*, 108 N.M. 643, 777 P.2d 371 (1989).

The majority's underlying assumption that the cause of action requires a malevolent motive or evil state of mind is reflected in the citation to the Restatement (Second) of Agency § 268 cmt. d and § 275 cmt. b and the denomination of the tort as "intentional." However, there is nothing in the New Mexico or foreign cases describing the public policy exception to at-will employment that supports any assertion that the tort contemplates any particular state of mind requirement. In particular, there is no indication in the case law that malice, evil intent or even personal animosity are necessary elements of the cause of action. The point is important to make because the types of tort cited as examples in the Restatement in which a state of mind is important include causes of action for fraud, deceit and malicious prosecution. *See id.* The motive and subjective knowledge of the person charged with torts such as these are clearly central to the claims.

The same is not true with regard to the tort of "retaliatory discharge." Under this cause of action, a plaintiff in New Mexico must demonstrate he acted or refused to act in furtherance of a clear public policy and that he was terminated or otherwise adversely affected because of his acts. *Chavez*, 108 N.M. at 647, 777 P.2d at 375. "The linchpin

of a cause of action for retaliatory discharge is whether by discharging the complaining employee the employer violated a 'clear mandate of public policy.'" *Shovelin v. Central N.M. Elec. Coop., Inc.,* 115 N.M. 293, 303, 850 P.2d 996, 1006 (1993). Thus, New Mexico emphasizes the policy goals of the tort, not the ill-motives or bad faith of the employer. In this regard, New Mexico has not based its public policy tort on the same theoretical grounds as cases such as *Cloutier v. Great Atlantic & Pacific Tea Co.,* 121 N.H. 915, 436 A.2d 1140 (1981). *See Monge v. Beebe Rubber Co.,* 114 N.H. 130, 316 A.2d 549 (1974) (basing New Hampshire's cause of action on the theory of breach of the requirement of good faith and fair dealing implicit within the employment contract).

Rather, New Mexico has based its public policy exception on the positive grounds of encouraging right conduct and creating a limited measure of job security for at-will employees, and has followed the theoretical approach of cases such as *Palmateer v. International Harvester Co.,* 85 Ill.2d 124, 52 Ill.Dec. 13, 421 N.E.2d 876 (1981). *See Vigil v. Arzola,* 102 N.M. 682, 688–89, 699 P.2d 613 (Ct.App.1983), *overruled in part on other grounds,* 101 N.M. 687, 687 P.2d 1038 (1984), *modified by Chavez v. Manville Prod. Corp.,* 108 N.M. 643, 777 P.2d 371 (1989). The clearest statement that neither malice nor bad faith are necessary elements of the tort is found in *Dixon Distributing Co. v. Hanover Insurance Co.,* 161 Ill.2d 433, 204 Ill.Dec. 171, 641 N.E.2d 395 (1994). I believe the discussion in *Dixon* is more in accord with New Mexico's approach to the tort than is the majority view.

In addition, it is not necessary to find a specific intent on the part of the employer to contravene public policy. Liability could be found even though the employer held a good faith belief that its conduct was in accord with public policy requirements. For example, I & W has asserted that it is not subject to the hours-in-service regulations relied upon by Plaintiff. I assume that belief is held in good faith by I & W management. That good-faith belief, however, would not protect I & W from enforcement actions by an administrative agency and it should not protect it from civil liability in the current case. Focusing on the malicious intent of the employer rather than on the mischief caused by the termination weakens the ameliorative aspects of the tort.

Absent a special state of mind requirement for the tort, there is no reason why the proximate cause connection between the employee's act and the firing cannot be inferred from the totality of the circumstances, including information imparted to an agent specifically hired to receive information pertinent to the decision to fire. To require more is analogous to the heightened requirement for proof of proximate cause this Court attempted to impose in *Tafoya v. Seay Bros. Corp.,* No. 14,998, slip op. (Ct.App., Nov. 2, 1993), *rev'd,* 119 N.M. 350, 890 P.2d 803 (1995). The majority comes dangerously close to requiring the employee to produce evidence that he: (1) conveyed an explanation of the employee's good motive (2) directly to the person who later terminates him in order to connect the employee's act with the relevant public policy and put the employer on explicit notice that action against the employee will contravene the public policy. In my view, this amounts to a reimposition of the "clear and convincing" evidentiary standard that was rejected in *Chavez. See* 108 N.M. at 649, 777 P.2d at 377. New Mexico cases simply do not require that kind of showing from plaintiffs, in particular on motion for summary judgment. To do so would also impose an unprecedented duty on the part of the employee to explain to the employer its duty under the law and its obligation not to commit the tort.

In this sense, the majority goes beyond even the Colorado Supreme Court's holding in *Martin Marietta v. Lorenz,* 823 P.2d 100 (Colo.1992) (en banc), in which the court required, as part of plaintiff's prima facie case, a showing that the employer was aware, or reasonably should have been aware, that the employee's refusal to perform the employer's directive was based on the employee's reasonable belief that the directive was illegal, contrary to clear statutory policy, or otherwise violative of the employee's rights

or privileges as a worker.[1] The Colorado court at least allowed proof of this element on the basis that the employer "should have been aware" of the employee's motives. The majority here requires actual, subjective knowledge by the employer.

Finally, the majority unfairly faults Plaintiff for not providing "direct legal authority" in support of his argument that information given the Answering Service should be treated as given to I & W. Plaintiff did cite to the Restatement (Second) of Agency, Sections 268 and 275. The courts of New Mexico have been known to cite to the Restatement as the sole authority in support of their decisions. *See, e.g., Broome v. Byrd,* 113 N.M. 38, 41, 822 P.2d 677, 679 (Ct.App.1991); *Gonzales v. Southwest Sec. & Protection Agency,* 100 N.M. 54, 56, 665 P.2d 810, 812 (Ct.App.1983). Application of the Restatement in this context is subject to reasonable discussion and disagreement. Reliance by the parties on the Restatement should not be dismissed so lightly, particularly in light of the unusual factual circumstances presented here.

Part of the Plaintiff's and the Court's difficulty in locating authority on point lies with the fact pattern we face. It is in part the novelty of the fact pattern that leads the majority to rely on non-employment cases to support its position. I do not quarrel with the correctness of those cases in their particular context, but they exhibit limited utility in analyzing the case before us. For example, a requirement of knowledge for purposes of a retaliation claim under Title VII of the 1964 Civil Rights Act is reasonable because that claim was statutorily created to protect persons asserting their rights under that particular statute. *See* 42 U.S.C. § 2000e–3(a); *Corley,* 639 F.2d at 1300; *Talley v. United States Postal Serv.,* 720 F.2d 505, 508 (8th Cir.1983), *cert. denied,* 466 U.S. 952, 104 S.Ct. 2155, 80 L.Ed.2d 541 (1984). Even in these instances, however, it is difficult to believe that notice given to an employee authorized to receive information of that kind and under a duty to convey the information

to management would not be imputed to the employer as a whole. *See Kimbro,* 889 F.2d at 876.

With the exception of *Hickman v. May Dep't Stores,* 887 S.W.2d 628 (Mo.Ct.App. 1994), the other authority cited by the majority is distinguishable because in those cases the employee failed to provide evidence that the employer was even aware that the employee engaged in the conduct that later served as the basis for the employee's claim of retaliation. *Cf. Parham v. Carrier Corp.,* 9 F.3d 383 (5th Cir.1993) (no evidence that employer knew employee had filed a worker's compensation claim before termination decision made); *Talley,* 720 F.2d at 508 (evidence was undisputed that supervisor who fired employee didn't know that employee had previously been employed by the postal service and had filed discrimination claims); *Carter v. Bennett,* 651 F.Supp. 1299, 1301 (D.D.C.1987) (no evidence employer knew employee had filed an EEO complaint before terminated); *Beckman v. Freeman United Coal Mining Co.,* 123 Ill.2d 281, 122 Ill.Dec. 805, 527 N.E.2d 303 (1988) (no evidence employer knew of employee's intent to file worker's compensation claim before termination). In contrast, in this case I & W knew that Plaintiff refused to come to work and terminated him for that reason. The issue is whether Plaintiff's conduct was insubordination or protected conduct. That issue is properly for the jury.

*Hickman* is distinguished because the applicable Missouri statute requires that an employee prove an exclusive causal relationship between filing a worker's compensation claim and the discharge. Also, the court required direct evidence of the discharging supervisor's knowledge that the claim was filed. In New Mexico, our Supreme Court has disavowed the direct evidence requirement in retaliatory discharge cases. *See Chavez,* 108 N.M. at 648, 777 P.2d at 376 (stating "it is not to be expected in cases of this type that a plaintiff would necessarily discover documentary or other direct evidence in support of his claim"). *Reich v.*

---

1. The imposition of this element has been roundly criticized, in particular in a law review article cited by the majority. Michael D. Wulfsohn,

Comment, *Martin Marietta v. Lorenz: Palpable Public Policy and the Superfluous Sixth Element,* 70 Denv.U.L.Rev. 589 (1993).

*Hoy Shoe, Co.*, 32 F.3d 361 (8th Cir.1994), on balance supports my view in that it reasserts the desirability of allowing the fact finder to decide if the employer acted in response to the OSHA complaint, even in the absence of direct evidence whether the employer knew which employee "blew the whistle" to OSHA. The *Reich* court emphasized the propriety of allowing the fact finder to determine the ultimate issues of protected conduct and motivation after a full evidentiary hearing rather than by summary judgment.

*Ortega v. IBP, Inc.*, 255 Kan. 513, 874 P.2d 1188 (1994), is inapposite because the direct issue in the case was the standard of proof to be required in retaliatory discharge cases in Kansas. In that regard, the Kansas Supreme Court decided that the standard of proof would be "by a preponderance of the evidence, but the evidence must be clear and convincing in nature." *Id.* at 1198. In so doing, the Kansas court rejected the New Mexico Supreme Court's approach to the issue articulated in *Chavez*, thus implicitly rejecting New Mexico's approach to the tort entirely.

It is unusual to see a termination such as this occurring immediately after one incident and with no direct contact between employer and employee. It is even more unusual to see a non-employee agent used first as a go-between and then as a shield against liability. It is unfortunate the majority uses this difficult fact pattern to impose significant new requirements and limitations on plaintiffs who rely on the public policy exception to the at-will doctrine. My suggested approach is better gauged to achieve the normative ends of the cause of action. I would treat information given to I & W's agent as being given to I & W for all purposes connected to this case, and I would allow a jury to infer that I & W discharged Plaintiff because he refused to violate the hours-in-service requirements based on (1) the employer's knowledge of those requirements, (2) its knowledge that Plaintiff had already worked 13½ hours that day, and (3) its termination of Plaintiff's employment upon Plaintiff's refusal to perform the requested act as explained to an agent of the employer's choosing, which agent had a duty to convey information from the employee to the employer.